UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. _______

ERIC E. GREENE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

CLEAR SPRING LIFE AND ANNUITY COMPANY; GROUP 1001 INSURANCE HOLDINGS, LLC; GROUP 1001, INC.; TWG GLOBAL HOLDINGS, LLC; GUGGENHEIM PARTNERS, LLC; and MARK WALTER,

Defendants.

_____________________________________/ DEMAND FOR JURY TRIAL

**CLASS ACTION COMPLAINT**

Plaintiff Eric E. Greene ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Clear Spring Life and Annuity Company ("Clear Spring"); Group 1001 Insurance Holdings, LLC and Group 1001, Inc. (collectively, "Group 1001"); TWG Global Holdings, LLC ("TWG"); Guggenheim Partners, LLC ("Guggenheim"); and Mark Walter ("Walter") (collectively, "Defendants"), alleging certain claims based upon Plaintiff's personal knowledge and experience, and upon information and belief as to all other matters, including review of relevant financial materials, civil regulatory documents, Plaintiff's policy records, rating-agency materials, and public reporting related to Defendants' business activities.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons and entities who purchased or exchanged into annuities issued by Clear Spring during the Class Period (defined below), including multi-year guaranteed annuities, fixed annuities, fixed index annuities, and associated riders and endorsements (collectively, the "Annuities"). Defendants uniformly misrepresented that the Annuities' guarantees were independently invested and that only a small percentage of Plaintiff's funds would be allocated to related-party investments.

2. Clear Spring, however, had invested nearly half of its assets into related-party investments. Those investments included billions of dollars of private credit obligations, which were privately negotiated loans and structured investments that functioned as loans to Walter-affiliated businesses.

3. Plaintiff brings claims under Indiana common law on behalf of the Nationwide Class (defined below) for fraudulent concealment, breach of contract and the implied covenant of good faith and fair dealing, fraud in the inducement, negligent misrepresentation, aiding and abetting fraud, civil conspiracy, unjust enrichment, and declaratory relief. Plaintiff brings Count VIII under the Florida Securities and Investor Protection Act, Florida Statutes §§517.301 and 517.211, solely for himself and the Florida Subclass (defined below). The Florida Insurance Code, including Part IX of Chapter 626, §§626.9541(1)(a), (b), (e), and (l), 626.9641, 626.99, and 627.4554, supplies duties and standards of conduct for the Florida Subclass.

4. Defendants directly and/or in concert induced Plaintiff and Class Members to purchase or exchange into Clear Spring annuity products by emphasizing guaranteed income, principal protection, fixed rates, index-linked benefits, and other benefits backed by the issuing insurer's financial strength and claims-paying ability. Defendants also misrepresented to credit

rating agencies and in their statutory filings that they were investing heavily in Walter-related businesses.

5. Defendants' guarantees to Plaintiff and others similarly situated were not independently backed by a separate fund or collateral that would protect Plaintiff against losses. Instead, the guarantees functioned as long-dated promises payable from Clear Spring's general accounts. The result of structuring the investments in this way created a different arrangement than what clients had bargained for—diversified and independently backed investments—and instead provided clients with a far riskier and illiquid financial investment predicated on the performance of Walter-related affiliates. These representations were also made to purchasers of Clear Spring's Annuity products.[1]

6. Clear Spring reported a small amount of related-party investments in its statutory filings and later restated a materially larger concentration. After federal subpoenas in February 2026 and internal reviews, Clear Spring disclosed that their financial statements required significant correction.

7. Clear Spring's corrected figures were filed on September 21, 2026 and reported affiliated assets of $5.895 billion against $9.923 billion of general-account invested assets, or 59%, at December 31, 2025 (restated); $5.323 billion against $10.142 billion, or 52%, at March 31, 2026; and $4.898 billion against $10.033 billion, or 49%, at June 30, 2026.

8. The corrected financial statements revealed that clients' assets were not diversified, as represented, but heavily dependent on Mark Walter's businesses. Clear Spring's exposure was several times its capital and surplus, which presented enormous risks for investors who had not

---

1 *See* Clear Spring Life and Annuity Co., *Product Center*, https://clearspringlife.com/product-center (last visited Oct. 1, 2026).

opted into that financial arrangement. And clients could not easily opt out of this arrangement because the Annuities carried surrender charges, Market Value Adjustments, and withdrawal restrictions that made early exit costly.

9. Clear Spring used standardized contract materials, which included a 30-day right to examine and receive a return of premium, subject to certain restrictions. Clear Spring did not disclose the February 2026 federal subpoenas to clients and continued to sell and deliver Annuities before purchasers' refund periods expired.

10. Clear Spring did not disclose the subpoenas and restate financial information until June 26, 2026, which was four months after the fact. Plaintiff seeks relief on behalf of purchasers who continue to hold one or more Annuities in force.

11. Plaintiff seeks rescission and return of premiums paid or applied without surrender charges, Market Value Adjustments, or other penalties; restitution of amounts already deducted; compensatory and punitive damages; declaratory and injunctive relief; and all other available remedies.

## PARTIES

12. Plaintiff Eric E. Greene is a natural person, and a resident and citizen of Florida. He was born in March 1962 and is a "senior consumer" within the meaning of Florida's annuity-suitability statute. Plaintiff purchased four Annuities issued by Clear Spring during the Class Period, as alleged below.

13. Defendant Clear Spring Life and Annuity Company (National Association of Insurance Commissioners ("NAIC") No. 83607) is a Delaware stock life insurer with administrative offices at 10555 Group 1001 Way, Zionsville, Indiana 46077, and is a wholly owned subsidiary of Group 1001 Insurance Holdings, LLC. Clear Spring is a citizen of Delaware

and Indiana. It was formerly Guggenheim Life and Annuity Company and originally Kansas City Variable Life Company, formed in 1985; Group 1001 acquired it through CSLIC Holdings, LLC effective November 12, 2021, and it was renamed Clear Spring on May 31, 2022. Clear Spring is ultimately controlled by Walter, is licensed in every state except New York, and has approximately $16 billion in total assets according to *Bloomberg*, including approximately $10.033 billion of general-account invested assets as of June 30, 2026. Clear Spring sold more than $747 million in direct individual annuity premiums in 2024. It markets its Annuities directly to consumers planning for retirement, describing itself as focused on "principal protection, tax-deferred accumulation, and retirement income" through "relatively simple, understandable product designs." Its contracts state that they are signed at its office in Indianapolis, Indiana and it services contracts from P.O. Box 80509, Indianapolis, Indiana.

14. Defendants Group 1001 Insurance Holdings, LLC and Group 1001, Inc. are, respectively, a Delaware limited liability company and a Delaware corporation, each with its principal place of business at 10555 Group 1001 Way, Zionsville, Indiana. Each is a citizen of Delaware and Indiana. They own and direct the Group 1001 insurance enterprise, including Delaware Life Insurance Company ("Delaware Life") and Clear Spring, and issue public statements and rating-agency communications concerning the insurers.[2]

15. Defendant TWG Global Holdings, LLC is a Delaware limited liability company with principal places of business in New York, New York and Chicago, Illinois. TWG is the holding company through which Walter controls Delaware Life, Clear Spring, Group 1001, and

---

[2] Delaware Life is not one of the Defendants in this case but it is one of the entities that Walter controls and has significant overlap with Clear Spring.

his stake in Guggenheim. TWG agreed to acquire or exchange reclassified insurer assets under remediation plans targeting substantial reductions in affiliated holdings.

16. Defendant Guggenheim Partners, LLC is a Delaware limited liability company with its principal place of business in New York, New York and a principal office in Chicago, Illinois. It is an asset-management firm with approximately $362 billion in assets under management. Guggenheim and its affiliate, Guggenheim Partners Investment Management, LLC ("GPIM"), managed or advised insurer portfolios and, upon information and belief, directed investments toward Walter-related entities.

17. Defendant Mark Walter is an individual, the CEO and co-founder of Guggenheim, and the CEO and Co-Chairman of TWG. Through TWG and Group 1001, Walter controls Delaware Life and Clear Spring. Walter is a citizen of Illinois and owns property in Florida.

18. Defendants other than Clear Spring are referred to collectively as the "Non-Issuer Defendants."

19. Additional third parties, affiliated entities, and other persons are presently unidentified, including, but not limited to, Egan-Jones Ratings Company ("Egan-Jones"), KPMG LLP ("KPMG"), ABS Capital ("ABS"), Amistad Financial ("Amistad"), Bradford Allen, and Hudson Trading Inc. ("Hudson Trading"). Plaintiff identifies them only as potential Unnamed Co-Conspirators, does not name them as defendants at this time, and reserves the right to amend this complaint.

20. For purposes of the Class Action Fairness Act, an unincorporated association such as a limited liability company is a citizen of the state where it has its principal place of business and the state under whose laws it is organized. 28 U.S.C. §1332(d)(10).

## JURISDICTION AND VENUE

21. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because this is a class action involving more than 100 putative Class Members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff is a citizen of Florida and is diverse from every Defendant. The Court also has authority to grant declaratory relief under 28 U.S.C. §§2201-2202.

22. This Court has personal jurisdiction over each Defendant under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and Florida Statutes Section 48.193. Defendants transacted business in Florida, directed Annuity solicitations and standardized materials into Florida, contracted to insure Florida residents and risks, and committed or caused tortious acts in Florida. Walter also owns property in Florida.

23. Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Miami-Dade County. The Annuities were marketed and solicited in the State of Florida, including in Miami-Dade County, and Defendants conduct substantial business in this District. Miami-Dade County is within the Miami Division under 28 U.S.C. §89(c).

## FACTUAL ALLEGATIONS

**Clear Spring Is an Authorized Insurer**

24. Clear Spring is a life insurer authorized to transact insurance business in Florida and throughout the United States except New York. It is subject to the Florida Insurance Code and oversight by the Florida Office of Insurance Regulation ("FOIR") and Department of Financial Services ("DFS").

25. Group 1001, TWG, and Walter control or direct Clear Spring, and Guggenheim and GPIM manage or advise their investment portfolios. Clear Spring and its affiliates acted through standardized forms, agents, investment managers, and public filings.

**Duties of Authorized Insurers**

26. Clear Spring is subject to Part IX of Chapter 626, Florida Statutes, which prohibits false or misleading representations in connection with insurance, misrepresentations concerning an insurer's financial condition, and knowingly filing false material statements with supervisory officials. This duty applies to those acting on an insurer's behalf.

27. Florida Statutes Section 627.4554 requires an insurer to have a reasonable basis to believe an annuity is suitable and to inform the consumer of its features. Replacement transactions require evaluation of new surrender periods and lost benefits. Section 626.99 requires an unconditional refund period for annuity contracts. The materials delivered to Plaintiff included Florida-specific specifications, replacement disclosures, and a right to examine the contracts.

28. The same duties exist in the states where Defendants sold the Annuities. Indiana prohibits unfair and deceptive insurance practices at Indiana Code Section 27-4-1-4. The Nationwide Class claims rely on Indiana common law, while Florida statutory claims are limited to the Florida Subclass. Defendants had substantial contact with Indiana from which they directed many of their activities and therefore the Nationwide Class rely on Indiana common law.

29. The true size of Defendants' affiliated party investments came from mandatory statutory accounting and insurance holding-company disclosures. Clear Spring was required to identify affiliate and related-party investments under applicable holding-company laws and NAIC Statements of Statutory Accounting Principles ("SSAP"), including SSAP No. 25, in schedules, notes, and historical data filed with regulators and relied upon by rating agencies.

30. Clear Spring repeatedly represented that the Annuities' guarantees were backed by its financial strength and claims-paying ability. These statements were materially misleading and impacted the value and security of the guarantees, in large part, because almost 60% of Clear Spring's investments as of the end of 2025 were affiliated investments.

**Background on Clear Spring's Annuities and Portfolio Scheme**

31. Clear Spring directed substantial policyholder premiums and other general-account assets into private-credit investments to affiliated businesses, including Walter-related businesses.

32. Walter serves as CEO of both Guggenheim and GPIM. Guggenheim and GPIM managed the Insurers' portfolios and introduced, originated, structured, managed, or valued the private-credit investments at issue. GPIM's investment-management relationship with Clear Spring was a related-party relationship even when filings represented otherwise.

33. For years, Clear Spring engaged in underreporting in its statutory filings of affiliated or related-party investments by representing that approximately 4% of its investments were affiliated or related party investments. As a result of the underreporting, purchasers were misled about the level of exposure and risk that their investments presented.

34. Following the start of the federal investigation, Clear Spring conducted internal reviews and disclosed material corrections on June 26, 2026. Clear Spring later reported $5.895 billion of affiliated assets, or 59% of general-account invested assets.

35. Clear Spring's investments exposed policyholder assets to illiquid, related-party credit, and limited the Insurers' own liquidity—all of which created more risk for the purchasers. The structures also obscured purchasers' visibility into the identity of borrowers and potential conflicts. The statutory filings made any connections impossible to identify.

**Clear Spring's Under-Reporting**

36. Clear Spring issued an update entitled "Information About Affiliated Investments Reduction Plan & Control Remediation Plan." In this update, the company disclosed on June 26, 2026, that in its 2025 audited statements and first-quarter 2026 quarterly statements a material portion of private credit previously reported as unaffiliated should have been classified as affiliated. Clear Springs also disclosed that there was a parallel investigation by the United States Attorney's Office in the Southern District of New York and the Securities and Exchange Commission.

37. Clear Spring also disclosed that the returns on the reclassified investments were dependent on affiliate performance and that, "once the misclassification was discovered, Clear Spring concluded deficiencies existed in internal control over financial reporting because it did not identify the related-party issue on a timely basis." Its table reported affiliated assets of $5,895 million against $9,923 million of general-account invested assets, or 59%, at December 31, 2025 (restated); $5,323 million against $10,142 million, or 52%, at March 31, 2026; and $4,898 million against $10,033 million, or 49%, at June 30, 2026. Statutory filings confirm that Clear Spring's affiliated investments moved from $5,894,580,687 to $4,897,742,722, a reduction of $996,837,965, or from 59.4% to 48.8% of invested assets.

38. Clear Springs disclosed that the December 31, 2025 amounts reflect additional related-party investments disclosed in its 2025 audited financial statements that were omitted from its 2025 Annual Statement. The update also describes a TWG Asset Purchase Agreement targeting approximately 10% affiliated assets by June 30, 2027, subject to regulatory approval. Clear Spring's implemented a public remediation plan titled "Clear Spring Life's Affiliated Investments

Reduction Plan and Control Remediation Plan." Group 1001 also filed a plan with the Delaware Department of Insurance to eliminate affiliated exposure.

39. Clear Spring's general-account invested assets that were upwards of 50% affiliate-related at year-end 2025 and at March 31, 2026. Clear Springs continued to sell Annuities during this time despite the pending federal investigation. Public analysis from Nick Nemeth ("Nemeth") titled, *Mispriced Assets*, dated August 24, 2026, reported that Clear Spring's 2025 annual statement listed only approximately $3.7 million of affiliated bonds on General Interrogatory 13.2, while the correct figures were approximately $3.8 billion ($3,804,926,940). Similarly, Clear Spring's originally filed year-end 2025 investments in parents, subsidiaries, and affiliates were only $458,518,408 while the correct figures were $5,894,580,687. Plaintiff alleges these facts on information and belief.

40. The Delaware Department of Insurance examination report for Clear Spring as of December 31, 2023, adopted June 23, 2025, shows cash and invested assets of approximately $10.35 billion and total capital and surplus of approximately $1.16 billion. According to the report, KPMG is Clear Spring's auditor. The restated affiliated assets of approximately $5.9 billion were approximately five times capital and surplus. The examination covering 2020-2023 and the prior examination of Guggenheim Life and Annuity covering 2016-2019, reported no significant findings or changes. Clear Spring paid dividends of approximately $25 million in 2020, $74.3 million in 2021, $100 million in 2022, $166 million in 2023, and $150 million in 2024. Upon information and belief, Clear Spring held approximately $1.2 billion of surplus, and paid its stockholders a further $135 million in dividends in 2025, while carrying assumed reinsurance liabilities from the same counterparties identified in the 2014 policyholder lawsuit equal to approximately 142% of that surplus.

41. Clear Spring's history extends back to at least 2019, when it operated as Guggenheim Life and Annuity and its investments have been managed by GPIM since 2009. Clear Spring has restated only 2025 figures; the extent of earlier misclassification is within Defendants' exclusive knowledge. *Bloomberg* reported that Clear Spring reduced related transactions by approximately $90 million. But upon information and belief, these issues have persisted since on or before January 1, 2019.

42. *The Wall Street Journal* reported that Clear Spring annuity holder Rick Phillips was abstaining from purchasing annuities and that the federal probe focused on approximately $20 billion of investments by Delaware Life and Clear Spring that were not properly identified as affiliated. AM Best's July 31, 2026 release and Clear Spring rating disclosure affirmed an A- rating but revised the outlook from positive to negative for Delaware Life and Clear Spring, citing a significant decline in risk-adjusted capitalization due to affiliated holdings previously identified as non-affiliated, a deficiency in management controls, and potential regulatory risk if charges were brought by prosecutors. AM Best explained that "the recent identification of affiliated investment holdings that were previously reported as unaffiliated points to a deficiency in management controls," and that "the negative outlooks reflect the group's decline in risk-adjusted capitalization following the federal investigation into affiliated assets being previously reported as unaffiliated." Despite this reporting, TWG publicly stated that "there has been no fraud" at Delaware Life and Clear Spring.

43. Upon information and belief, AM Best adjusted its outlook on all three Group 1001 life insurers within days of the public disclosure of the grand jury investigation. Fitch described the restated affiliated exposure as the highest it has ever rated in a North American life insurer.

**Prior Lawsuits Against Walter's Companies**

44. A class of policyholders sued Walter and Guggenheim in 2014 for similar misconduct. That suit alleged that the use of class members' funds was not disclosed in regulatory filings and that the insurers obscured investments—including Walter's purchase of the Los Angeles Dodgers in 2012. The complaint was voluntarily dismissed without prejudice the next day. Despite this suit, Walter continued engaging in the same misconduct for years.

45. That suit alleged that billions of dollars had been funneled to affiliates and that the trail of transactions had been covered by reinsurance coded to Heritage Life. The insurers stated in their regulatory filings that Heritage was also unaffiliated. According to Heritage Life's own statutory filings, reprinted in that complaint, Daniel Jonathan Towriss ("Towriss") was simultaneously Heritage Life's Chief Risk Officer ("CRO"), Chief Actuary, Secretary, and a Director while serving as President and CEO of Guggenheim Life, one of the ceding insurers, and Heritage Life's administrative office was Guggenheim Life's own address in Indianapolis. Using only public documents, that complaint calculated approximately $445 million of dividends and $273 million of fees leaving the insurers over three years. Delaware Life continues to cede a block of structured settlements to Heritage Life of Arizona, the same charter, under a reinsurance treaty signed in 2020, and Delaware Life's current annual statement answers "No" to the interrogatory asking whether any reinsurer listed as non-affiliated is controlled, directly or indirectly, by the reporting entity or its affiliates. Plaintiff pleads these reported facts on information and belief.

**Parallel Federal Investigations, Credit Rating Actions, and Subsequent Fallout**

46. An ongoing parallel federal investigation between the Southern District of New York and the SEC is looking into whether Delaware Life, Clear Spring, Guggenheim, Walter, or related entities concealed that private-credit investments backed other parts of Walter's business

empire. Despite the federal probes, Clear Spring continued in the same pattern of conduct—i.e., soliciting, issuing, and delivering Annuities to unknowing investors.

47. The *Financial Times* reported previously undisclosed connections between Walter's empire, an effort to divest more than $20 billion in misclassified insurer investments, and a web of assets funded by U.S. retirees. The *Financial Times* also reported that a whistleblower flagged investments from Guggenheim Private Investments, which booked approximately $275 million of revenue for services purportedly provided by Walter-linked entities, including Amistad Capital Funding. The concerns went to federal prosecutors and KPMG, which warned of shortcomings in revenue recognition but nonetheless issued clean opinions. In response, Walter reportedly offered to pledge his Guggenheim equity as collateral for short-term TWG financing, and public reporting connected asset sales, including the Lakers and a stake in Chelsea Football Club, to remediation efforts.

48. In August 2026, TWG agreed to swap or purchase up to $6.5 billion of Delaware Life's related-party investments for assets classified as independent. The remediation plans targeted affiliated holdings of approximately 20% to 25% by year-end 2026 and less than 10% by June 30, 2027, pending approval from regulators.

**Walter's Web of Businesses**

49. Independent reporting also highlights Walter's self-dealing. In Nemeth's Substack, *Mispriced Assets*, he explains how Clear Spring's own statutory filings show that Walter controls both sides of the transactions with respect to annuities purchases. Walter controls Guggenheim, whose GPIM unit manages money for the Clear Spring. GPIM is designated "U" for unaffiliated in its filings. Walter also controls TWG Global Holdings, LLC, whose subsidiary TWG Financial Holdings owns 91.89% of Group 1001, and whose operating arms are the borrowers: the PDIF

complex under TWG Lending & Debt, Bahia Energy under TWG Infrastructure, the Bradford Allen feeder under TWG Real Estate, and the Intrepid and Bedrock consumer-finance businesses. Group 1001 runs Delaware Life (approximately $64.7 billion in assets), Clear Spring (approximately $15.3 billion), and Gainbridge Life ("Gainbridge") (approximately $1.7 billion).

50. According to this reporting, Clear Spring's as-filed affiliates totaled approximately $511 million, while its restated total affiliated investments were approximately $5.89 billion, consisting of approximately $3.80 billion of restated bonds, $1.26 billion of affiliated short-term paper, $0.32 billion of Gainbridge common stock, and $0.51 billion of preferred, mortgage, and other investments.

51. Nemeth's report also shows Clear Spring's restated short-term bucket of approximately $1.22 billion ties to its filed schedule to the dollar. Named Walter and Amistad entities, including Amistad STF I and Bradford Allen Term Investors, are designated as unaffiliated.

52. Clear Spring's Schedule D shows 66 such issuers totaling approximately $2.36 billion, with vintages dating back to 2018. None of the 261 candidate issuers appears on the approximately 780-entry organizational charts the insurers filed. The analysis cautions that membership of any single row is inferred, and that at least one large candidate may be a genuine third-party program.

53. The analysis also reports intra-group transactions bearing on Clear Spring's financial condition. On December 4, 2025, Clear Spring marked its stake in its affiliate Gainbridge at approximately $317.1 million, while the prior year reported a $63.0 million stake. On the same day, paper was transferred into Gainbridge from Clear Spring account codes. Gainbridge's filings contain no mention of the subpoenas or the investigation. Delaware Life and Clear Spring together

held approximately $587 million of debt of American Media (the Dodgers' television network that is designated as "unaffiliated,") and Clear Spring still carries the 2012 Dodgers-purchase vehicles GLAC GBM Investco and Paragon GBM Investco. The analysis calculates that Delaware Life's affiliate-contingent bonds equal approximately 3.1 times its total adjusted capital and Clear Spring's equals approximately 2.9 times. It also reports that $150 million of Delaware Life surplus notes held by a Sammons insurer were exchanged on January 27, 2026 into a new self-rated instrument, and that a Delaware Life ordinary-annuity cession to Clear Spring opened on January 1, 2026.

54. Walter's web of businesses employ the same people. Towriss, CEO of Group 1001, was at December 31, 2012, the CRO, Chief Actuary, Secretary, and a Director of Heritage Life while also serving as CEO of Guggenheim Life, Clear Spring's predecessor. Dennis Cullen has served simultaneously as a director of Delaware Life, Delaware Life and Annuity Company, Clear Spring, and EquiTrust. Guggenheim's own fund disclosures state, "TWG Global, LLC holds an indirect, substantial economic interest in Guggenheim Capital, and thus is an indirect substantial owner of the Investment Manager. Further, TWG is controlled by a senior officer of Guggenheim Capital. Certain of TWG's subsidiaries are advisory clients of, and pay fees to, the Investment Manager."

55. Nemeth also reported that American Media is registered at the mailing address of Dodger Stadium and was formed by Guggenheim Baseball Management, the Walter-led group that bought the team. Its debt is the largest single holding at both Delaware Life and Clear Spring and is filed as a loan to an unaffiliated third party, alongside approximately $4 million of notes issued by Dodger Tickets LLC, which is also reported as an unaffiliated entity. Nemeth reported that GPIM has managed Delaware Life's money since 2014 and Clear Spring's since 2009, and

that Delaware Life's investor presentation stated that the $16 billion had been "omitted from the Company's 2025 Annual Statement."

56. Nemeth also reported that the Delaware Life and Clear Spring hold roughly 230 limited liability companies with invented names that have been disclosed as unaffiliated. These companies are not included on Delaware Life and Clear Spring's organizational chart. According to Delaware Division of Corporations records, Verdemont Hills Financial, and Pinezanita Hills Financial were incorporated on the same day (July 3, 2024) and funded by the two Insurers four months later. Baumfree Corporate Finance was incorporated on October 30, 2020, and funded seven days later, alongside Cinque Capital and Lilla SJ Capital at the same size. All use the same mass registered agent. Nemeth also reported that Delaware Life paid Egan-Jones $3.73 million in 2025, which was an increase of $1.63 million from the prior year and under $1 million the year before. Nemeth's reporting also indicates that Egan-Jones is the only credit rater Delaware Life pays.

57. Nemeth further reported that roughly $27 billion of affiliated or affiliate-linked paper sits across the Delaware Life and Clear Spring against approximately $5 billion of combined surplus, and that Delaware Life cedes risk to affiliated and offshore reinsurers, including a captive whose treaty does not transfer insurance risks. He reported that Towriss runs Group 1001 today, and that Burnaby Collateral Holdings—a shell named in the 2014 policyholder complaint—remains on Delaware Life's books as an $8.9 million collateral loan carried at cost. Towriss also ran the Guggenheim insurer named in the 2014 policyholder complaint. In a later post, Nemeth reported that eight life insurers filing under four nominally separate owners hold one book of the same $40.6 billion. Plaintiff pleads these reported facts on information and belief.

**Egan-Jones**

58. *The Los Angeles Times* and *Bloomberg* reported on August 20 and 21, 2026 that Walter's Insurers (Delaware Life and Clear Spring) often relied on Egan-Jones, a minor ratings company, which supplied the only known ratings for more than one-fifth of their bond assets. At Clear Spring, at least 50% of its approximately $6.3 billion bond book was exclusively rated by Egan-Jones. The U.S. Department of Justice obtained records concerning Egan-Jones's work for Delaware Life and Clear Spring.

59. The *Financial Times* reported that Walter's Insurers (Delaware Life and Clear Spring) paid millions of dollars to Egan-Jones. *The Wall Street Journal* reported on August 6, 2026 that Egan-Jones had rated approximately $40 billion of insurer debt, supplied scores for 37% of Delaware Life's private-letter-rated debt, and that Delaware Life and Clear Spring held nearly $300 million of American Media debt that both designated as unaffiliated in their 2025 filings.

60. *Bloomberg* reported on November 6, 2025, that SEC enforcement attorneys in its complex financial instruments unit were examining whether Egan-Jones and senior executives exerted improper commercial influence on ratings procedures. In Exchange Act Release No. 105067 (March 23, 2026), the SEC stated that Egan-Jones's application and other non-public information raised questions about whether its resources were adequate to consistently produce credit ratings with integrity, particularly in light of prior Section 15E examinations.

61. The SEC had previously revoked Egan-Jones's ABS and government registrations for material misstatements in 2013 (Release No. 68703), and a June 2022 settled order (Release No. 95127) found that Egan-Jones issued or maintained a rating while CEO Sean Egan was improperly influenced by sales or marketing considerations and imposed a $1.7 million penalty.

62. Upon information and belief, Egan-Jones ratings supported favorable NAIC designations and statutory capital treatment for affiliated or affiliate-dependent assets that lacked transparent market pricing. Egan-Jones is identified only as a potential Unnamed Co-Conspirator, not a named defendant; Plaintiff reserves the right to amend if discovery establishes their roles.

**Plaintiff's Annuity Transactions**

63. **The Clear Spring Annuities**. On or about February 6, 2024, Clear Spring issued Plaintiff, then aged 61, four (4) Single Premium Deferred Annuities from Clear Spring (collectively, the "Clear Spring Annuities"). Plaintiff funded each annuity with a contribution of $122,500, for a total contribution amount of $490,000. Clear Spring issued the following policy numbers to Plaintiff, as owner and annuitant: #0200402551, #0200402552, #0200402553, and #0200402554.

64. Clear Spring Annuity #0200402551 has a nine-year guarantee period, a ten-year guaranteed interest rate of 5.31%, and surrender charges beginning at 7% in the first contract year. This annuity has not been surrendered and remains in force.

65. Clear Spring Annuity #0200402552 has a five-year guarantee period, a ten-year guaranteed interest rate of 3.42%, and surrender charges beginning at 7% in the first contract year. This annuity has not been surrendered and remains in force.

66. Clear Spring Annuity #0200402553 has a six-year guarantee period, a ten-year guaranteed interest rate of 3.91%, and surrender charges beginning at 7% in the first contract year. This annuity has not been surrendered and remains in force.

67. Clear Spring Annuity #0200402554 has a seven-year guarantee period, a ten-year guaranteed interest rate of 4.37%, and surrender charges beginning at 7% in the first contract year. This annuity has not been surrendered and remains in force.

68. Plaintiff continues to hold his Clear Spring Annuities all of which remain in force. He cannot exit these contracts without incurring surrender charges and Market Value Adjustments.

69. Plaintiff is a member of the Nationwide Class and the Florida Subclass by virtue of continuing to hold his four Clear Spring Annuities, which remain in force.

70. Clear Spring's approved materials represented that guarantees were backed by the issuing insurer's financial strength and claims-paying ability. Plaintiff alleges on information and belief that he received and relied on those standardized materials, which did not disclose the true affiliated concentration, the February 2026 subpoenas, the control deficiencies, or the resulting risks to the insurers' ability to pay.

71. Had Plaintiff known the truth about Clear Spring's asset concentrations and investigations, he would not have purchased or retained the Annuities. Had he learned the truth before the applicable right-to-examine periods expired, he would have returned the contracts for full refunds. The surrender schedules and Market Value Adjustments impaired his ability to exit without loss.

72. The concealment caused present economic injuries, including overpayment and loss of the benefit of the bargain, loss of the right to cancel without penalty, surrender charges and Market Value Adjustments, exposure to diminished contract value, and loss of informed retirement-planning opportunities. Class Members who replaced existing annuities also lost prior riders, benefits, or surrender-free positions.

73. Clear Spring's contracts and sales materials represented that each insurer would pay contract proceeds according to the contract terms and that guarantees depended on its financial strength. Those representations were materially misleading because the insurers' general-account

assets were substantially concentrated in affiliate-dependent investments and because the insurers continued selling while the classification was under federal scrutiny.

74. Clear Spring's rating actions and remediation efforts confirm materiality. AM Best affirmed A- ratings but revised the outlook to negative; S&P revised Delaware Life's outlook to negative; Fitch placed Delaware Life on negative watch; Delaware Life and Clear Spring targeted substantial reductions in affiliated holdings; and financial institutions Truist and Fifth Third entirely paused sales of the Annuities after the disclosures. These events occurred after Plaintiff and Class Members committed retirement assets. On September 24, 2026, reporting citing *Bloomberg* stated that Apollo CEO Marc Rowan criticized the Delaware Department of Insurance for allowing more than $20 billion of investments to be labeled unaffiliated.

75. The federal investigation and public disclosures did not reveal the full scope of the scheme. Defendants have not identified every loan and intermediary whose repayment depended on Walter-related parties. The complete extent of the misclassification, including earlier years and Clear Spring's pre-2025 figures, remains within Defendants' exclusive knowledge.

**The Class, Plaintiff's Reliance, and Their Injuries**

76. Plaintiff relied on Clear Spring's standardized representations and omissions in paying or applying $490,000 in premiums. He reasonably believed that his retirement assets were supporting promises backed by diversified and financially sound insurers, rather than portfolios materially dependent on Walter-related affiliates.

77. Plaintiff is left with the same double bind as other Class Members: remain exposed to insurers whose reported asset classifications had been materially corrected, or pay the surrender charge and Market Value Adjustment to exit.

78. Plaintiff and Class Members suffered present, concrete, and quantifiable economic loss, including the following:

(a) **Overpayment/benefit of the bargain**. Plaintiff and Class Members paid for long-term unsecured promises represented to be backed by financially strong insurers with substantially independent assets. They instead received promises backed by portfolios materially concentrated in affiliate-dependent private credit.

(b) **Loss of the right to examine**. Defendants' concealment ran through applicable 30-day refund periods, eliminating a costless right to cancel and return premium.

(c) **Surrender charges and Market Value Adjustments**. Class Members who surrendered paid or incurred charges, and those who remain in force must pay charges to exit.

(d) **Replacement and retirement losses**. Class Members who exchanged existing annuities lost vested riders, death benefits, established income or withdrawal benefits, or surrender-free positions, while starting new surrender periods and exposure to Market Value Adjustments.

(e) **Diminution in contract value**. The restatements, rating actions, investigations, and distributor pauses impaired the value of the Annuities and the security of the promised benefits.

**Tolling, Fraudulent Concealment, and the Discovery Rule**

79. Any applicable limitations period is tolled by the discovery rule and Defendants' fraudulent concealment. Under Florida Statutes Section 95.031(2)(a), an action founded on fraud accrues when the facts constituting the fraud are discovered, not when Defendants successfully concealed them. Indiana Code Section 34-11-5-1 likewise permits an action after discovery when a liable person conceals the facts. Plaintiff and Class Members could not, with reasonable

diligence, discover the true concentration from filings that reported a small percentage and omitted the investigation. Defendants are estopped from asserting a limitations defense based on their concealment.

**CHOICE OF LAW**

80. Indiana common law governs the claims of the Nationwide Class. Clear Spring, Group 1001 Insurance Holdings, LLC, and Group 1001, Inc. maintain their principal place of business at 10555 Group 1001 Way, Zionsville, Indiana, and the conduct giving rise to the claims emanated from Indiana. From there, Defendants prepared statutory statements, drafted and approved standardized contracts and sales materials, accepted applications, issued and administered Annuities, and decided to continue sales after the subpoenas.

81. Indiana has the most significant relationship to the Nationwide Class claims because the misrepresentations and omissions were conceived, prepared, and disseminated from Indiana and did not vary by purchaser residence. Indiana's insurance law supplies the standard of conduct for the Indiana-based enterprise, while the common law claims are pleaded uniformly across the Class.

82. Florida law applies to Plaintiff and the Florida Subclass. Plaintiff asserts Count VIII under Florida Statutes Sections 517.301 and 517.211 solely on behalf of himself and the Florida Subclass. Florida's Insurance Code, including Part IX of Chapter 626, §§626.9541(1)(a), (b), (e), and (l), 626.9641, 626.99, and 627.4554, supplies duties and standards of conduct as to that Subclass.

83. Alternatively, if another state's law governs a Class Member's claim, the common law of fraudulent concealment, fraud in the inducement, negligent misrepresentation, breach of contract and the implied covenant, aiding and abetting fraud, civil conspiracy, and unjust

enrichment does not vary in any respect material to the issues common here. Any variations can be managed through grouped instructions or additional state subclasses.

## CLASS ACTION ALLEGATIONS

84. The "Class Period" is between January 1, 2019 through June 26, 2026, inclusive. It begins with the first year in which Plaintiff is aware Clear Spring's statutory statements reported affiliated investments at a small fraction of their true level and ends when the federal subpoenas and restated information were first disclosed. Plaintiff alleges on information and belief that the misclassification existed throughout the period, but likely began earlier; the precise extent is within Defendants' exclusive knowledge.

85. Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of himself and the following classes:

> All persons and entities who, during the Class Period, purchased or exchanged into an annuity issued by Delaware Life Insurance Company and/or Clear Spring Life and Annuity Company, including a multi-year guaranteed, fixed, fixed index, or variable annuity or associated rider or endorsement, and who received standardized contract, disclosure, illustration, or point-of-sale materials representing that the guarantees were backed by the issuing insurer's financial strength and claims-paying ability (the "Nationwide Class").[3]

86. Plaintiff also brings this action on behalf of the following subclass:

> All members of the Nationwide Class who purchased or exchanged into their annuity while residing in Florida, or whose annuity was issued for delivery in Florida (the "Florida Subclass").

---

[3] For ease of reference, the Nationwide Class and Florida Subclass are referred to collectively as the "Class," and their members as "Class Members."

87. Excluded from the Class are: (a) Defendants, their officers, directors, and employees; (b) any entity in which any Defendant has a controlling interest; (c) the affiliates, legal representatives, attorneys, heirs, and assigns of any Defendant; (d) members of the judiciary to whom this action is assigned and their immediate families; (e) persons who timely elect exclusion; and (f) persons who have previously released claims encompassed by this action.

**Numerosity**

88. Upon information and belief, the Nationwide Class and Florida Subclass includes tens of thousands of annuity purchasers. Clear Spring reports hundreds of thousands of active annuities and life policies. Joinder is impracticable, and the precise numbers are within Defendants' knowledge and can be determined through discovery.

**Ascertainability**

89. The Class is ascertainable by objective criteria in Clear Spring's records, including the identity of the issuing insurer, product, date of issue and delivery, purchaser's state of residence, standardized forms delivered, surrender status, and charges assessed. No individualized merits inquiry is required to determine membership.

**Commonality**

90. There are questions of law and fact common to all Class Members that predominate over individual questions, including the following:

(a) whether Defendants sold or caused Class Members to purchase or exchange into Annuities issued by Clear Spring based on representations about financial strength and claims-paying ability;

(b) whether Clear Spring's statutory statements from at least 2019 through 2025 materially understated affiliated and related-party investments;

(c) whether Clear Spring knowingly filed or caused false material statements concerning the its financial condition with insurance regulators;

(d) whether Clear Spring had superior and exclusive knowledge of the true concentration, the subpoenas, and the control deficiencies and concealed them from purchasers;

(e) whether Clear Spring owed duties to disclose the true concentration and investigation because they spoke about financial strength and claims-paying ability and were subject to insurance statutes;

(f) whether the concealed concentration and related-party conflicts rendered Clear Spring's financial-strength, claims-paying-ability, and guaranteed-income representations materially misleading;

(g) whether the uniform representations and omissions violated Indiana common-law standards and, as to the Florida Subclass, Florida Statutes §§626.9541(1)(a), (b), (e), and (l), 626.9641, 626.99, and 627.4554;

(h) whether Clear Spring effected replacement or exchange transactions through misleading comparisons or omissions in violation of the standards reflected in Florida Statutes Section 626.9541(1)(l) and analogous law;

(i) whether Clear Spring continued soliciting and issuing Annuities after receiving the February 2026 subpoenas without disclosing them before right-to-examine periods expired;

(j) whether Walter, Guggenheim, TWG, Group 1001, and the other Non-Issuer Defendants had general awareness of the improper activity and provided substantial assistance;

(k) whether Clear Spring and Non-Issuer Defendants agreed to misreport affiliated concentrations and committed overt acts in furtherance of a conspiracy;

(l) whether Clear Spring breached the Annuity contracts or the implied covenant by concealing material information and enforcing surrender charges after disclosure;

(m) whether Clear Spring were unjustly enriched by retaining premiums, fees, surrender charges, Market Value Adjustments, and the use of policyholder assets;

(n) whether Annuities issued by Clear Spring to Florida purchasers are securities or investment contracts under Chapter 517 and were sold through untrue statements or omissions in violation of Section 517.301;

(o) whether Class Members are entitled to rescission, return of premium without penalties, restitution, compensatory or punitive damages, and other relief;

(p) whether the concealed information was material to a reasonable annuity purchaser and whether reliance may be presumed or inferred from the standardized materials and uniform omissions;

(q) whether Clear Spring's contracts and riders impose surrender charges and Market Value Adjustments that may not be enforced to defeat rescission or return of premium;

(r) whether Plaintiff and Class Members suffered damages from the concealed concentration, misleading guarantee representations, and charges incurred or required to exit; and

(s) whether declaratory, injunctive, rescissionary, return-of-premium, restitutionary, interest, fee, and other relief should be awarded to the Class.

91. The common questions predominate because the core liability issues can be resolved from standardized forms, statutory filings, regulatory disclosures, and common proof concerning Clear Spring's portfolios and Defendants' coordinated conduct.

92. Individual differences in premium, product, surrender status, or deductions concern remedies and do not defeat common liability questions or class treatment.

**Typicality**

93. Plaintiff's claims are typical of the Class's claims. He purchased Annuities issued by Clear Spring during the Class Period using standardized materials representing that guarantees were backed by the issuing insurer's financial strength and claims-paying ability.

**Adequacy of Representation**

94. Plaintiff will fairly and adequately protect the interests of Class Members. His interests are aligned with the Class and he has no conflicts. He has retained counsel experienced in class action, insurance, securities, consumer, and complex litigation.

**Predominance**

95. Common questions of law and fact predominate over any questions affecting only individual Class Members. The central issues in this case are common to all Class Members and can be resolved on a Class-wide basis. They include whether Defendants marketed Annuities issued by Clear Spring based on financial-strength and claims-paying-ability representations; whether the true related-party concentration—approximately 49% to 59% at Clear Spring—was concealed; whether that omission made the guarantees misleading; whether the Annuity sales and the related misrepresentations and omissions violated the standards of conduct established by the Indiana Insurance Code and, as to the Florida Subclass, Florida's Insurance Code, including Part IX of Chapter 626; whether Clear Spring breached applicable contracts and riders; and whether Class Members are entitled to rescission and return of premium without surrender charges.

96. The Annuity-sale transactions and the misrepresentations and omissions were common across the Class. Defendants used standardized annuity applications, disclosure statements, specifications pages, illustrations, contracts, and marketing materials, prepared at Clear Spring's shared Zionsville, Indiana headquarters, to present guaranteed rates, lifetime-

income benefits, and insurer-backed guarantees while omitting the true related-party concentration. The concealed concentration is itself subject to common proof: the same invented-name private-credit borrowers appear on Clear Spring's schedules, acquired on the same days, under the same manager. Whether those materials and conduct violated the standards of conduct established by the Indiana Insurance Code and, as to the Florida Subclass, Section 626.9541 of Florida's Insurance Code, whether Defendants are liable under Indiana common law, and whether Class Members are entitled to rescission, return of premium, or damages can therefore be determined on a Class-wide basis, subject to any individualized remedies issues.

97. The application of a single body of law to the Nationwide Class is appropriate and does not defeat predominance. For the reasons alleged above, Indiana common law governs the claims of the Nationwide Class, and Florida statutory law applies only to the claims of the Florida Subclass. In the alternative, any variation in the governing law can be managed through grouped jury instructions or state subclasses. In any event, the claims of the class turn on a single course of conduct, identical for every member: Defendants' concealment of the Clear Spring's affiliated concentration while selling, administering, and enforcing exit charges on the Annuities.

**Superiority**

98. A class action is superior to other available methods. Separate actions would create a risk of inconsistent adjudications and impose individual burdens disproportionate to the common relief sought. Class treatment provides economy, uniformity, and efficient supervision by one court.

99. This action is also maintainable under Fed. R. Civ. P. 23(b)(2) because Defendants acted on grounds generally applicable to the Class, making declaratory and injunctive relief

appropriate, including a declaration that surrender charges and Market Value Adjustments may not be enforced against Class Members who elect to rescind contracts procured by concealment.

## CAUSES OF ACTION

### COUNT I
### Fraudulent Concealment and Nondisclosure in the Solicitation, Sale, and Replacement of Insurance
### (On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)

100. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

101. Plaintiff brings this Count under Indiana common law on behalf of himself and the Nationwide Class, and the Florida Subclass. The allegations of this Count concerning the Florida Insurance Code are made on behalf of Plaintiff and the Florida Subclass only. To the extent Indiana law does not apply to Count I, it is asserted under Florida law on behalf of the Florida Subclass.

102. The Annuities are an “annuity contract” and an “insurance policy” or insurance product within the meaning and regulatory scope of Florida’s Insurance Code and the insurance codes of the other states in which they were sold. That includes Plaintiff’s Clear Spring Annuities (Contract Nos.: #0200402551, #0200402552, #0200402553, and #0200402554) and the materially similar Annuities and riders offered or sold to Class Members. The Annuities are subject to Florida’s insurance regulatory framework, including oversight by the FOIR and the DFS, and to applicable insurer and insurance-agent licensing requirements.

103. Clear Spring is an “insurer” within the meaning and regulatory scope of Florida’s Insurance Code. Walter, Group 1001, TWG, and Guggenheim participated in, directed, approved, or materially aided the conduct and transactions alleged herein, as described above and below.

104. Under Indiana law, which governs this Count as to the Nationwide Class, the standard of conduct for Defendants’ concealment is supplied by the Indiana Insurance Code’s

prohibition of unfair and deceptive acts and practices in the business of insurance, Indiana Code Section 27-4-1-4. That statute governs the conduct of the Zionsville, Indiana headquarters from which Delaware Life and Clear Spring prepared their statutory statements and drafted, approved, and disseminated the standardized sales materials at issue. Section 27-4-1-4(a) defines as unfair and deceptive, among other things: misrepresenting the terms of any policy or the benefits or advantages it promises; making any misleading representation or misrepresentation as to the financial condition of any insurer or the legal reserve system upon which any life insurer operates; making any misrepresentation to a policyholder for the purpose of inducing the policyholder to lapse, forfeit, or surrender existing insurance; placing before the public any untrue, deceptive, or misleading statement with respect to the conduct of an insurance business; and, with intent to deceive, filing with a public official any false statement of an insurer's financial condition, or making false entries in, or omitting true entries of material fact from, an insurer's books, reports, or statements. Ind. Code §27-4-1-4(a)(1)(A), (a)(1)(C), (a)(1)(E), (a)(2), (a)(5). Plaintiff does not contend that Section 27-4-1-4 creates a private right of action; it establishes the standard of conduct against which Defendants' common-law duties are measured. The unfair-insurance-trade-practices statutes of the other states in which Class Members purchased their Annuities prohibit the same conduct in materially identical terms.

105. As to Plaintiff and the Florida Subclass, Florida's Insurance Code independently supplies the same standard of conduct. Part IX of Chapter 626, Florida Statutes (§§626.951–626.99) is the "Unfair Insurance Trade Practices" part. Section 626.951(1) declares its purpose "to regulate trade practices relating to the business of insurance" by defining, or providing for the determination of, practices in Florida that constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

106. Section 626.9521 prohibits any person from engaging in this state in any trade practice that is defined in Part IX, or determined pursuant to Section 626.951 or Section 626.9561, to be an unfair method of competition or an unfair or deceptive act or practice involving the business of insurance.

107. Section 626.9531, concerning identification of insurers, agents, and insurance contracts, forms part of that regulatory framework. Defendants' applications, disclosures, specifications pages, contracts, and sales materials identified Clear Spring, the agents, and the Annuities, but the conduct alleged herein undermined the accurate insurance disclosures required by that framework.

108. Section 626.9641, the Policyholders' Bill of Rights, recognizes that policyholders are entitled to insurance advertising and other selling approaches that provide accurate and balanced information on the benefits and limitations of a policy, and to an insurance company that is financially stable. Defendants' conduct deprived Plaintiff and Class Members of those protections in connection with their Annuity transactions.

109. Section 626.9541(1)(a), entitled, "Misrepresentations and false advertising of insurance policies," defines as an unfair or deceptive act knowingly making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, statement, sales presentation, omission, comparison, or property and casualty certificate of insurance altered after being issued, which: (1) "[m]isrepresents the benefits, advantages, conditions, or terms of any insurance policy"; (4) "[i]s misleading, or is a misrepresentation, as to the financial condition of any person or as to the legal reserve system upon which any life insurer operates"; or (6) "[i]s a misrepresentation for the purpose of inducing, or tending to induce, the lapse, forfeiture, exchange, conversion, or surrender of any insurance policy."

110. Section 626.9541(1)(b), entitled, "False information and advertising generally," defines as an unfair or deceptive act knowingly making, publishing, disseminating, circulating, or placing before the public, or causing to be so placed, in any form or by any means, "an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance, which is untrue, deceptive, or misleading."

111. Section 626.9541(1)(e), entitled, "False statements and entries," defines as an unfair or deceptive act knowingly filing with any supervisory or other public official, or making, publishing, disseminating, circulating, delivering to any person, or placing before the public, "any false material statement," and "[k]nowingly making any false entry of a material fact in any book, report, or statement of any person, or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report, or statement of such person." This provision addresses the conduct at the heart of this action. Clear Spring's 2025 Annual Statement listed only approximately $3.7 million of affiliated bonds on General Interrogatory 13.2, against restated affiliated bonds of approximately $3.8 billion and total restated affiliated assets of $5.895 billion, or 59% of general-account invested assets. Clear Spring has admitted that the restated amounts were omitted from its 2025 Annual Statement. These false regulatory statements were not collateral to the sale; they were the foundation of the financial-strength representation that Defendants placed at the center of every point-of-sale document delivered to Plaintiff and the Class.

112. Section 626.9541(1)(l), entitled, "Twisting," defines as an unfair or deceptive act "[k]nowingly making any misleading representations or incomplete or fraudulent comparisons or fraudulent material omissions of or with respect to any insurance policies or insurers for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain,

pledge, assign, borrow on, or convert any insurance policy or to take out a policy of insurance in another insurer." Plaintiff's Clear Spring Annuities were materially misrepresented because they omitted the fact that bore most on the value of the Clear Spring and guarantees: Clear Spring had misreported their related-party concentration by an order of magnitude.

113. Defendants' conduct falls within Indiana Code Section 27-4-1-4(a)(1)(A), (a)(1)(C), (a)(1)(E), (a)(2), and (a)(5), within the parallel provisions of other states' statutes, and, as to the Florida Subclass, within Section 626.9541(1)(a)1, (1)(a)4, (1)(a)6, (1)(b), (1)(e), and (1)(l). The guaranteed-rate, guaranteed-income, and financial-strength representations misrepresented the benefits and terms of the Annuities. Defendants concealed Clear Spring's related-party concentration of approximately 49% to 59% (approximately $5.9 billion, or roughly five times its capital and surplus), against the small single-digit percentages previously reported. That concealment was misleading and a misrepresentation as to Clear Spring's financial condition and the legal reserve system upon which it operates, bearing directly on its financial strength and claims-paying ability. In reliance on those representations, Plaintiff committed $490,000 of retirement savings to Clear Spring, and accepted a new five-year surrender period beginning at 7%, plus exposure to a Market Value Adjustment.

114. As to the Florida Subclass, Section 626.9631 provides that the provisions of Part IX are cumulative to rights under the general civil and common law, and that no action of the department, commission, or office shall abrogate those rights to damages or other relief in any court. Plaintiff does not assert that Section 626.9541(1)(a) creates a freestanding private right of action. Rather, Defendants' Insurance Code violations establish the wrongful conduct and standard of conduct underlying the common-law claims of Plaintiff and the Florida Subclass, and support

the damages, rescission, return-of-premium, and other relief preserved and remediable through Section 626.9631 and the common law.

115. Defendants owed Plaintiff and Class Members a duty to disclose the true related-party concentration and the pendency of the federal grand jury subpoenas. That duty arose independently from three sources. First, Defendants had superior and, as a practical matter, exclusive knowledge of Clear Spring's true financial condition. Clear Spring is not a public reporting company, and its condition was knowable to consumers only through the statutory filings Defendants themselves rendered false. Second, having elected to speak about Clear Spring's financial strength and claims-paying ability, and having made that subject the express foundation of every guarantee they sold, Defendants assumed a duty to speak fully and truthfully about it and could not tell a half-truth that created a materially false impression. Third, the Indiana Insurance Code, the insurance codes of the other states in which the Annuities were sold, and, as to the Florida Subclass, the Florida Insurance Code impose affirmative disclosure obligations on insurers in the sale and replacement of annuities. Those obligations arise under Indiana Code Section 27-4-1-4 and, as to the Florida Subclass, Florida Statutes Sections 626.9541(1)(a)-(b), (e), and (l), 626.9641, 626.99, and 627.4554, and under the replacement and comparison forms Defendants themselves delivered. In addition, Delaware's Insurance Holding Company System Registration statute, 18 Del. C. ch. 50, and NAIC statutory accounting principles required Clear Spring to report its affiliated investments truthfully in the statutory statements on which every financial-strength rating and representation depended. Section 5005(a)(1)(e) requires that "[t]he books, accounts and records of each party to all such transactions shall be so maintained as to clearly and accurately disclose the nature and details of the transactions."

116. Defendants made statements and omissions concerning the Annuities' guaranteed rates and income, the financial strength of the issuing insurer, and its claims-paying ability. Those statements and omissions were false or misleading when made. Defendants materially understated the related-party concentration as a small single-digit percentage while the true concentration was approximately 49% to 59% at Clear Spring, or approximately $5.9 billion. The concealed concentration bore directly on Clear Spring's financial strength and ability to pay claims.

117. The guaranteed-rate, guaranteed-income, financial-strength, and claims-paying-ability representations and omissions were material to a reasonable purchaser of an annuity. Defendants knew or should have known that those representations and omissions were false and misleading because of their superior knowledge of Clear Spring's assets, related-party relationships, reserves, and ability to perform their guarantees. As to the period on and after February 2026, Defendants had actual knowledge: they had been served with federal grand jury subpoenas directed at the very classification they were representing. They concealed both the subpoenas and the underlying misclassification while continuing to sell Annuities and to administer, and collect exit charges on, existing contracts, including Plaintiff's.

118. Plaintiff and Class Members relied on, and were induced by, Defendants' representations and omissions to purchase or exchange into the Annuities, to pay or apply premiums, and to retain the Annuities. Plaintiff paid $490,000 in premiums to Clear Spring for Contract Nos. #0200402551, #0200402552, #0200402553, and #0200402554. Because the omissions at issue were uniform, material, and made by parties with a duty to disclose, reliance may be presumed on a Class-wide basis.

119. As a direct and proximate result, Plaintiff and Class Members were damaged. Their damages include premiums paid or applied; surrender charges and Market Value Adjustment

charges actually paid or, for Class Members still holding their contracts, presently owed (charges already incurred); other withdrawal restrictions; loss of the benefit of their bargain; loss of the unconditional right to return the contract for a full refund of premium; and loss of the opportunity to make informed annuity decisions.

120. Plaintiff and Class Members are entitled to rescission and return of the premium paid or applied, without deduction (or repayment) of surrender charges, Market Value Adjustments, or other penalties, including as to Plaintiff's Clear Spring Contract Nos. #0200402551, #0200402552, #0200402553, and #0200402554. Class Members who have already surrendered are entitled to restitution of the surrender charges, Market Value Adjustments, and other amounts deducted on surrender.

121. Plaintiff and Class Members further seek compensatory damages and, for Defendants' knowing and willful conduct, punitive damages, together with pre- and post-judgment interest and reasonable attorneys' fees and costs to the extent available by law. Plaintiff does not rely on Florida Statutes Section 624.155 as a civil remedy for the Insurance Code violations alleged in this Count and does not assert that Section 624.155 creates a private right of action for Section 626.9541(1)(a).

122. As a direct and proximate result of Defendants' fraudulent concealment and nondisclosure, Plaintiff and the Class have been damaged and are entitled to rescission and return of premium without surrender charges, compensatory and punitive damages, interest, and reasonable attorneys' fees and costs, together with such other relief as this Court deems just and proper.

**COUNT II**
**Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing (On Behalf of Plaintiff and the Nationwide Class, Against Clear Spring)**

123. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

124. To the extent Indiana law does not apply to Count II, it is asserted under Florida law on behalf of the Florida Subclass.

125. Plaintiff and Class Members entered into binding annuity contracts with Clear Spring in connection with their purchases or exchanges. Plaintiff's contracts are Clear Spring Contract Nos. #0200402551, #0200402552, #0200402553, and #0200402554, under which Clear Spring agreed to to pay the proceeds.

126. Plaintiff's Annuity contracts and riders set forth Clear Spring's obligations. The disclosure materials represented that the guarantees were backed by the issuing insurer's financial strength and claims-paying ability. Plaintiff pleads these writings together or, in the alternative, as separate contractual and tort representations as permitted by law.

127. The Annuity contracts and riders issued by Clear Spring to Class Members set forth the same obligations owed to Plaintiff, and made the same representations that guarantees were backed by Clear Spring's financial strength and claims-paying ability.

128. Under Indiana law, which governs this Count as to the Nationwide Class, there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured, and that duty includes the obligation to refrain from deceiving the insured. The Annuities are insurance contracts issued by life insurers. The implied covenant of good faith and fair dealing they carry bars Clear Spring from acting in a manner that destroys or injures Class Members' right to receive the fruits of their contracts, and it governs the exercise of any discretion the contracts confer. Clear

Spring breached that covenant by: (a) issuing and administering contracts whose central promise was expressly conditioned on their own financial strength while knowingly misreporting the composition of the assets supporting that strength; (b) allowing contractual and statutory unconditional refund periods to expire without disclosing the true affiliated concentration and, for purchases on and after February 2026, the federal grand jury subpoenas; and (c) invoking, or reserving the right to invoke, the withdrawal and surrender charge schedules and Market Value Adjustments to penalize Class Members who seek to exit contracts procured by that concealment.

129. Clear Spring breached by issuing and administering Plaintiff's and Class Members' Annuities while concealing the material concentration that directly affected the financial-strength and claims-paying-ability basis of the promised guarantees, and by failing to honor the guaranteed-rate, guaranteed-income, and GLWB obligations as represented.

130. The contracts' surrender-charge schedules, together with the Market Value Adjustments, impede and impeded Plaintiff's and Class Members' ability to unwind the transactions. Those schedules include Clear Spring's charges beginning at 7% in the first contract year. If Clear Spring contends that these charges apply to rescission or return of premium after their material breach and concealment, that position further breaches the contracts and the implied covenant. In any event, Plaintiff seeks return of the premium without those charges, or return of both the premium and the surrender charges.

131. Plaintiff and Class Members have performed all conditions, covenants, and obligations required of them under the applicable Annuity contracts and riders, or such performance has been excused by Clear Spring's material breach.

132. As a direct and proximate result of Clear Spring's breach of the applicable Annuity contracts and riders and of the implied covenant of good faith and fair dealing, Plaintiff and Class

Members have suffered damages. Those damages include, but are not limited to, the loss of the benefit of their bargain, the premium paid or applied, the withdrawal and surrender charges and Market Value Adjustment charges Clear Spring assessed on exit or that Class Members must pay in order to exit, diminution in the value and recoverability of their annuities, and other damages to be proven.

**COUNT III**
**Fraud in the Inducement/Fraudulent Misrepresentation (On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

133. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

134. To the extent Indiana law does not apply to Count III, it is asserted under Florida law on behalf of the Florida Subclass.

135. Defendants made material representations of fact to Plaintiff in connection with the solicitation and sale of his four Annuities, each an insurance product and annuity contract, and, upon information and belief, made materially similar representations to Class Members. The materials also disclosed the surrender schedules and Market Value Adjustments, and represented that all guarantees were backed by Clear Spring's financial strength and claims-paying ability.

136. These representations were made or repeated by Defendants through their officers, agents, and approved sales materials, including Clear Spring's applications, specifications pages, and disclosure materials, and the materials used and relied on by Plaintiff at or before each application and through issuance and delivery of each Annuity. The agents certified that they used only insurer-approved sales materials.

137. Defendants' representations were materially misleading when made because they conveyed that Clear Spring's financial strength supported the guarantees while omitting the true

allocation of assets to Walter-related entities. Upon information and belief, when Defendants represented the Annuities' guarantees and claims-paying-ability backing, they knew or recklessly disregarded that the related-party concentration was approximately more than 50% at Clear Spring, while small single-digit figures had been reported or represented to regulators and the public.

138. Clear Spring received federal grand jury subpoenas in February 2026 directed at whether private-credit investments introduced by an affiliate should have been treated as related-party transactions. From that point, Defendants knew that the classification underlying their financial-strength representations was under federal criminal scrutiny. They continued to sell, continued to administer Plaintiff's and Class Members' contracts, and said nothing until June 26, 2026.

139. Scienter is further supported by several facts: (a) the magnitude of the discrepancy: Clear Spring reported approximately $3.7 million of affiliated bonds against approximately $3.8 billion restated, with total affiliated assets roughly five times its capital and surplus; (b) the structural character of the misclassification, which required interposing nominally unaffiliated intermediaries between the insurers and the ultimate economic exposure, including 27 invented-name borrowers placed on both insurers' books on the same days; (c) upon information and belief, the batch formation of shell borrowers shortly before they were funded; (d) Walter's control of both the insurers and the entities on the other side of the transactions; (e) the 2014 policyholder lawsuit, which put Walter and his insurers on notice of the same conduct more than a decade earlier; Towriss ran the Guggenheim insurer named in that suit and runs Group 1001 today; and (f) the placement of former Guggenheim private-credit personnel in the insurers' investment function.

140. Defendants made and repeated these representations and omissions with the intent to induce Plaintiff and Class Members to purchase or exchange into Clear Spring annuities, to tender their premiums, and to retain the contracts. Defendants knew that the represented guaranteed rates, lifetime-income benefits, and financial-strength-backed guarantees were material to decisions whether to replace an existing annuity and commit retirement assets to Clear Spring.

141. Plaintiff relied on Defendants' representations and omissions in purchasing Clear Spring Contract Nos. #0200402551, #0200402552, #0200402553, and #0200402554, applying $490,000 of retirement savings in total. Had Plaintiff known the true related-party concentration and its bearing on Clear Spring's guarantees, he would not have proceeded with those transactions. His reliance was reasonable. Clear Spring is not a public reporting company, and the only public information about their financial condition derives from the statutory filings Defendants rendered false and the ratings built upon them. The law of every state presumes this asymmetry, which is why it obligates insurers to disclose, and Defendants directed Plaintiff's attention to the insurer's financial strength as the foundation of every guarantee they sold.

142. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and Class Members have suffered damages. Those damages include, but are not limited to, the premium paid or applied; the Annuities' withdrawal and surrender charges and Market Value Adjustments actually paid or presently owed; the forfeiture, upon surrender, of the guaranteed rates and lifetime income for which they paid; loss of the benefit of their bargain; loss of alternative retirement-income opportunities; loss of the unconditional right to return the contract for a full refund; and the risk of losing benefits associated with an existing annuity exchanged or replaced in reliance on Defendants' inducements.

143. Defendants' conduct was willful, wanton, and undertaken with conscious disregard for the rights of Plaintiff and Class Members. Defendants' fraudulent scheme was designed to enrich Walter and his related entities by concentrating the insurers' assets supporting annuity guarantees in Walter-related entities while purchasers were told that Clear Spring's financial strength and claims-paying ability backed their guarantees. Plaintiff and Class Members are therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

**COUNT IV**
**Negligent Misrepresentation (In the Alternative, On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

144. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

145. In the alternative to Count III, and to the extent Defendants' misrepresentations were not made knowingly or with intent to deceive, Defendants negligently misrepresented several matters: the Annuities' guaranteed rates, income, and rider benefits; Clear Spring's financial strength and claims-paying ability; and the related-party concentration. Defendants also negligently omitted the true concentration from the information supplied to Plaintiff and Class Members.

146. To the extent Indiana law does not apply to Count IV, it is asserted under Florida law on behalf of the Florida Subclass.

147. Defendants owed a duty of care to Plaintiff and Class Members to provide accurate information regarding the Annuities' benefits, fees, withdrawal restrictions, financial-strength and claims-paying-ability backing, and related-party concentration. This duty arose from the parties' contractual relationship, Defendants' superior knowledge of the insurers' portfolios and

guarantees, and the trust and confidence that purchasers placed in Defendants as insurers, asset managers, and professional financial participants. The duty is independently imposed by the Indiana Insurance Code, including Indiana Code Section 27-4-1-4; by the materially identical insurance codes of the other states in which the Annuities were sold; and, as to the Florida Subclass, by the Florida Insurance Code, including Sections 626.9541(1)(a)-(b), (e), and (l), 626.9641, and 627.4554. Those statutes establish the standard of conduct governing an insurer's communications with annuity purchasers and exist for the protection of the class of persons to which Plaintiff belongs.

148. Defendants breached their duty of care by supplying or approving information that emphasized guaranteed rates, principal protection, lifetime income, and financial-strength-backed guarantees while failing to disclose the related-party concentration of approximately 49% to 59% at Clear Spring, and failing to disclose that only small single-digit figures had been reported to regulators and the public. Defendants failed to exercise reasonable care in ascertaining or communicating the true concentration and its significance to the ability to pay claims.

149. Defendants supplied materially similar information to Plaintiff and Class Members for the guidance of their annuity purchase and exchange decisions. Defendants knew, or should have known, that purchasers would rely on representations concerning guaranteed rates and income and the insurer's financial strength and claims-paying ability in deciding whether to commit premiums and replace existing annuities.

150. Plaintiff and Class Members reasonably relied on Defendants' representations and omissions. Such reliance was reasonable given Defendants' position as insurers and professional asset managers, their superior access to information regarding the true related-party concentration

and claims-paying ability, and the fact that purchasers had no independent means of verifying the insurers' portfolio allocations when making their annuity decisions.

151. As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiff and Class Members have suffered damages. Those damages include, but are not limited to, the premium paid or applied, exposure to the Annuities' withdrawal and surrender charges and Market Value Adjustments, loss of alternative retirement-income opportunities, loss of the benefit of the bargain, and other damages to be proven.

**COUNT V**
**Aiding and Abetting Fraud**
**(On Behalf of Plaintiff and the Nationwide Class, Against the Non-Issuer Defendants)**

152. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

153. This Count is asserted against the Non-Issuer Defendants. Clear Spring is the primary wrongdoer whose fraud the Non-Issuer Defendants aided and abetted.

154. To the extent Indiana law does not apply to Count V, it is asserted under Florida law on behalf of the Florida Subclass.

155. An underlying fraud occurred. Clear Spring misrepresented financial condition to regulators and purchasers, concealed the true concentration and subpoenas, and induced Plaintiff and Class Members to purchase or exchange into the Annuities and tender premiums.

156. Each Non-Issuer Defendant knew of the fraud or had general awareness that its role was part of an overall improper activity. Walter controlled the insurers and businesses receiving the financing; TWG and Group 1001 controlled the insurers; and Guggenheim and GPIM managed, introduced, or valued the investments.

157. Walter sat on both sides of the transactions and had been placed on notice by the 2014 policyholder lawsuit. TWG undertook remediation and issued public statements concerning the insurers. Group 1001 owned and directed Clear Spring and controlled the standardized materials and filings.

158. Guggenheim and GPIM originated, introduced, structured, managed, or valued the private-credit investments. GPIM managed Clear Spring investments under an Investment Management Agreement effective December 17, 2009, which the Delaware Department of Insurance's 2023 examination report identifies as a related-party agreement.

159. KPMG audited Delaware Life and Clear Spring, issued clean opinions, and issued unqualified opinions on restated statements despite warning about GPI revenue recognition. Egan-Jones supplied ratings used for insurer assets. KPMG and Egan-Jones are potential Unnamed Co-Conspirators only and are not named as defendants.

160. The Non-Issuer Defendants rendered substantial assistance by designing, funding, directing, or executing structures that interposed nominally unaffiliated intermediaries, causing assets to be reported as unaffiliated, approving standardized sales materials, obtaining Egan-Jones ratings, issuing clean audit opinions, and continuing sales after the subpoenas.

161. The assistance proximately caused Plaintiff's and Class Members' injuries because the financial-strength representations were false only because of the structures, classifications, ratings, and omissions the Non-Issuer Defendants designed, approved, or facilitated.

162. Plaintiff and Class Members are entitled to compensatory damages, restitution, and punitive damages against the Non-Issuer Defendants, jointly and severally with Clear Spring to the extent permitted by law.

**COUNT VI**
**Civil Conspiracy**
**(On Behalf of Plaintiff and the Nationwide Class, Against the Non-Issuer Defendants)**

163. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

164. This Count is asserted against the Non-Issuer Defendants. Clear Spring is alleged as primary wrongdoers and co-conspirators but are not named as defendants in this Count. To the extent Indiana law does not apply to Count VI, it is asserted under Florida law on behalf of the Florida Subclass.

165. The Non-Issuer Defendants, Clear Spring, and the Unnamed Co-Conspirators agreed to deploy policyholder premiums as financing for Walter-related businesses while reporting the investments as unaffiliated and representing that the insurers' exposure was small. The object included false regulatory filings and misleading annuity sales in violation of Indiana and, as to the Florida Subclass, Florida insurance law.

166. Overt acts included structuring loans through ABS, Amistad, Bradford Allen, and Hudson Trading Inc.; reporting them as unaffiliated; designating GPIM as unaffiliated; obtaining ratings from Egan-Jones; issuing clean KPMG audit opinions; drafting standardized materials; soliciting and issuing Annuities after subpoenas; remaining silent through refund periods; and refusing penalty-free rescission.

167. The conspiracy is not barred by the intracorporate conspiracy doctrine because Guggenheim, Egan-Jones, KPMG, the intermediary entities, and other Unnamed Co-Conspirators were separate enterprises, and Walter acted for his personal economic interests in addition to any corporate role.

168. Plaintiff and Class Members suffered damage as a direct and proximate result of the overt acts, including overpayment, diminished contract value, surrender charges, Market Value Adjustments, and loss of informed cancellation rights.

169. Each conspirator is jointly and severally liable for acts committed in furtherance of the conspiracy, and Plaintiff and Class Members seek compensatory and punitive damages accordingly.

**COUNT VII**
**Unjust Enrichment**
**(In the Alternative, On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

170. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein, and pleads this Count in the alternative to Count II if any contract is void, voidable, unenforceable, or does not bind a particular Defendant.

171. To the extent Indiana law does not apply to Count VII, it is asserted under Florida law on behalf of the Florida Subclass.

172. Plaintiff and Class Members conferred direct benefits on Defendants by paying premiums, fees, surrender charges, and Market Value Adjustments to Clear Spring. Those premiums were deployed as financing for Walter-related businesses and generated benefits for the Non-Issuer Defendants and their investment managers.

173. Defendants knew of and voluntarily accepted the benefits. Delaware Life and Clear Spring retained premiums and charges; Group 1001, TWG, Walter, and related businesses received the use of policyholder capital; and Guggenheim and GPIM received or expected fees for managing or introducing investments.

174. It would be inequitable for Defendants to retain those benefits because they were obtained through concealment of the affiliated character of the assets supporting the guarantees and through exit charges imposed after the truth emerged.

175. Plaintiff and Class Members have no adequate remedy at law.

176. Plaintiff and Class Members are entitled to restitution and disgorgement of premiums, surrender charges, Market Value Adjustments, fees, and other benefits unjustly obtained, together with interest.

**COUNT VIII**
**Violation of the Florida Securities and Investor Protection Act, Florida Statutes Sections 517.301 and 517.211 (In the Alternative, On Behalf of Plaintiff and the Florida Subclass, Against Clear Spring and the Non-Issuer Defendants)**

177. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein. Plaintiff pleads this Count solely on behalf of himself and the Florida Subclass.

178. The Annuities are securities or investment contracts within the meaning of Florida Statutes Section 517.021. Purchasers invested money in Clear Spring's general accounts with an expectation of returns and guaranteed or index-linked benefits derived from Defendants' managerial and investment efforts. The statutory exemption for insurer-issued annuities from registration does not exempt them from the antifraud provisions of Section 517.301 or remedies under Section 517.211.

179. Section 517.301(1)(a) prohibits schemes to defraud, obtaining money by untrue statements or material omissions, and transactions or practices operating as a fraud or deceit in connection with the offer or sale of a security. Defendants obtained Plaintiff's and the Florida Subclass's premiums while representing that guarantees were backed by financial strength and concealing the true affiliated concentrations and investigations.

180. Under Section 517.211, Clear Spring and persons who personally participated in or aided the sales are liable for rescission if the purchaser still owns the security or damages if the purchaser surrendered it. Walter, TWG, Group 1001, Guggenheim, and Clear Spring participated in or aided the sales through control, standardized materials, investment structures, ratings, and continued offerings.

181. Plaintiff and Florida Subclass members who surrendered are entitled to damages, including the difference between consideration paid and amounts received, interest, and restitution of charges. Members who still hold Annuities are entitled to rescission and return of consideration upon tender, without surrender charges or Market Value Adjustments, together with attorneys' fees under Section 517.211(6).

182. Plaintiff and the Florida Subclass seek all relief available under Sections 517.301 and 517.211, including rescission, damages, interest, fees, and costs.

**COUNT IX**
**Declaratory Judgment, 28 U.S.C. §§2201-2202**
**(On Behalf of Plaintiff and the Nationwide Class, Against Clear Spring)**

183. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

184. An actual, present, and justiciable controversy exists between Plaintiff and Class Members, on the one hand, and Clear Spring, on the other, concerning rights and obligations under the Annuities. Class Members who remain in force must decide whether to pay surrender charges and Market Value Adjustments to exit or remain exposed to insurers whose affiliated investments were materially misreported.

185. Plaintiff and the Nationwide Class are entitled to a declaration that: (a) the Annuities were procured by Clear Spring's concealment of material facts and are voidable at the

purchaser's election; (b) a purchaser who rescinds is entitled to return of premium without surrender charges, Market Value Adjustments, or other penalties; (c) charges assessed against purchasers who surrendered after June 26, 2026 must be refunded; and (d) Clear Springs may not enforce exit charges to defeat rescission or return of premium.

186. Plaintiff further seeks necessary or proper relief under Section 2202, including an injunction prohibiting Clear Spring from assessing surrender charges or Market Value Adjustments against Class Members who elect to rescind contracts procured by concealment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully prays for judgment against Defendants, jointly and severally, and requests the following relief:

A. An Order certifying the Nationwide Class and the Florida Subclass as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A judgment declaring that Clear Spring breached the applicable annuity contracts and riders and that Defendants are liable to Plaintiff and the Class;

C. A judgment declaring that the undisclosed affiliated concentration materially undermined or rendered misleading Defendants' representations concerning Clear Spring's financial strength and claims-paying ability, that the Annuities are voidable at the purchaser's election, and that surrender charges and Market Value Adjustments may not be enforced to defeat rescission or return of premium;

D. An award of compensatory damages to Plaintiff and the Class, including rescission and return of premiums paid or applied in each transaction without surrender charges, Market Value Adjustments, or other penalties, and an award of all such charges already paid;

E. An award of rescission, return of premium, restitution, and disgorgement under Indiana common law and, for the Florida Subclass, the Florida Securities and Investor Protection Act and Florida common law;

F. An award of punitive damages sufficient to punish Defendants and deter similar conduct, and compensatory and punitive damages against the Non-Issuer Defendants, jointly and severally, on the aiding and abetting and civil conspiracy claims;

G. Pre- and post-judgment interest at the maximum rate permitted by law;

H. An award of attorneys' fees and costs of suit;

I. An Order enjoining Defendants from concealing or misrepresenting the affiliated concentration of assets supporting annuity guarantees and from enforcing surrender charges or Market Value Adjustments to impede rescission or return of premium; and

J. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED: October 23, 2026

**PODHURST ORSECK, P.A.**

By:*/s/Peter Prieto*___________________
Peter Prieto (FBN 501492)
pprieto@podhurst.com
Matthew P. Weinshall (FBN 84783)
mweinshall@podhurst.com
Jacob Koffsky (FBN 1018115)
jkoffsky@podhurst.com
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
Telephone: (305) 358-2800

***Attorneys for Plaintiff and the Class***